**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| 2105-09 S. STATE, LLC, an Illinois Limited Liability Company; REGGIE'S BAR & GRILL, LLC, an Illinois Limited Liability Company; REGGIE'S MUSIC CLUB, LLC, an Illinois Limited Liability Company, | ) ) ) ) ) | Case No. 20-cv-06278 |
| | ) | Hon. |
| Plaintiff, | ) ) | |
| v. | ) ) | JURY TRIAL DEMANDED |
| THE CINCINNATI INSURANCE COMPANY, an Ohio Corporation, | ) ) ) | |
| Defendant. | ) ) | |

**COMPLAINT (INCLUDING CLASS ACTION COMPLAINT IN THE ALTERNATIVE)**

Plaintiffs 2105-09 S. State, LLC, Reggie's Bar & Grill, LLC, Reggie's Music Club, LLC, (collectively "Plaintiffs" or "Reggie's") by and through their attorneys, Fuksa Khorshid, LLC, and on behalf of all those similarly situated (with respect to Counts IV and V seeking a rebate of premium on behalf of a Nationwide Class, in the alternative under Fed. R. Civ. P. 8(d)(2) and (3)), states and alleges its Complaint against The Cincinnati Insurance Company ("Defendant" or "Cincinnati") as follows:

**NATURE OF THE ACTION**

1.     Reggie's is a small business – operating two successful establishments featuring live music, food, and beverages in the Chicago area, a Music Joint and a Rock Club.

2.     Plaintiffs assert claims for business interruption insurance coverage under "all-risk" commercial property insurance issued and sold to them by the Defendant Cincinnati. Under longstanding and bedrock principles of insurance law, Plaintiffs are entitled to payment under those policies for business income losses suffered as a direct result of state, municipal and local executive shutdown orders and restrictive executive reopening orders ("Closure Orders") that caused direct physical loss or damage to their properties by physically impairing, detrimentally altering, and rendering them nonfunctional or only partially functional as the businesses and institutions they were formerly.

1

3.      Prior to the Closure Orders, Plaintiffs' businesses were vibrant, bustling and successful. But the Closure Orders brought an end to all of that activity by imposing direct physical restrictions that impaired Plaintiffs' properties and rendered them nonfunctional for their intended purpose. By altering the physical premises – all of which are critical to Plaintiffs' operations – their establishments were materially and detrimentally altered by the Closure Orders.  Under the Closure Orders, Plaintiffs had to close or block off sections of their physical spaces, create or install barriers, manipulate fixtures and other equipment into nonfunctional arrangements, place physical markers on floors and walls, and redesign routes for entrance and egress. Vast amounts of square footage in their spaces – many painstakingly designed to maximize the customer's experience and the business' revenues – were lost, detrimentally altered, and rendered nonfunctional for their intended purpose.

4.      To protect its businesses from risk, Plaintiffs purchased a business owner's policy for commercial properties from Cincinnati. This nearly 70-page Policy contract was authored and issued by Defendant and contains numerous promises to pay Plaintiffs – also known as "coverages" – for a broad range of losses that the Plaintiffs might suffer including business interruption.  A true and correct copy of the business owner's policy (the "Policy") is attached hereto as Exhibit A and incorporated by reference herein.

5.      At the time Defendant underwrote and sold the Policy, it understood and expected that it would be insuring these properties as fully functioning and operational businesses.  Defendant knowingly calculated Plaintiffs' business interruption premiums based in material part on the revenue it expected Plaintiffs to generate as fully functioning and operational businesses. Defendant is fully aware that Plaintiffs' businesses and properties have been physically impaired by the Closure Orders and that Plaintiffs have lost the means to generate that revenue – *i.e.*, that Plaintiffs have suffered direct physical loss of and damage to its insured properties.  Defendant is fully aware that with no operations or partial operations, a universe of risks for which it would pay business interruption and other claims is now mitigated or entirely absent.  A shuttered kitchen (for example) has no fires.  When (for example) bars, restaurants, retail floors and beauty parlors have no customers (or customers limited to fractional capacity) there are no or fewer

other kinds of claims under the Policy. Defendant's claims payout records since March 1, 2020 (and compared to prior years) will bear out what it has saved. Yet Defendant has continued to charge and accept full premium payments from insureds as if insured properties have remained fully functional and operational.  This is the basis for an unjust enrichment claim against the Defendant, which must be upheld in the event that coverage is denied. This unjust enrichment claim is pled in the alternative pursuant to Fed. R. Civ. P. 8(d)(2) and (3) on behalf of a Fed. R. Civ. P. 23(b)(3) Nationwide Class of Cincinnati's policyholders whose businesses were in any manner impaired or constrained by Closure Orders, and is found in Count IV.  This same misconduct also supports a claim (Count V) by Plaintiffs and the Nationwide Class for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* ("ICFA") and the similar laws of other states where Defendant sells insurance.

6.      Stated in plain terms, Defendant can't "have its cake and eat it too" – either it needs to pay Plaintiffs on business income losses they sustained due to Closure Orders, or, if Cincinnati prevails against coverage, then these Plaintiffs and all others similarly situated in a Nationwide Class must receive a rebate of premium for the windfall that Cincinnati kept for itself by reduced claims due to Closure Order shutdowns, partial operations mandates and other constraints.  This is a prime example of why Fed. R. Civ. P. 8(d)(2) and (3) exist to render complete justice to the aggrieved.  As set out in Counts IV and V, this premium rebate claim is eminently appropriate for class adjudication, and these are claims Defendant must face if it prevails on its arguments against coverage.

7.      Despite the fact that Defendant has accepted Plaintiffs' insurance premium payments, Defendant has summarily denied Plaintiffs' claims for coverage arising from government-ordered interruption and closure of its businesses, in breach of Defendant's contractual obligations under the Policy. Defendant denied Plaintiffs' claims with a cursory letter sent (on information and belief) in substantially similar form to all of Defendant's insureds, without any reasonable explanation or individualized investigation or consideration. A true and correct copy of this denial letter is attached hereto as Exhibit B and incorporated by reference herein.

8.      As Defendant Cincinnati is well aware, "all risk" commercial property policies cover all

possible risks of any kind or description, unless specifically excluded. Unlike "enumerated perils" property insurance, which covers only specified causes of loss, all-risk property insurance provides business insureds with the comfort of knowing that even unprecedented and unanticipated risks of loss are covered. Due to the breadth of coverage, Plaintiffs paid a substantial premium for this type of insurance. Here, the Closure Orders are clearly within the scope of "all risks" covered by the Policy. This basis for coverage is referred to herein as the "Closure Order Basis for Coverage" and is one of two major bases of coverage alleged by the Plaintiffs herein. Fed. R. Civ. P. 8(d)(2), (3).

9.      As set forth at length herein, Plaintiffs have been forced to file this action for a declaratory judgment in response to Defendant's misconduct and refusal to meet its obligations under the Policy, in order for this Court to establish that Plaintiffs are entitled to receive the benefit of the insurance coverage it purchased. Plaintiffs seek reimbursement and indemnification of the business losses they have sustained, as well as all damages arising out of Defendant's breach of contract and Defendant's bad faith claims handling under 215 ILCS 5/155. As pled in more detail herein, Plaintiffs pose two major bases for coverage, one of which is known as the "Closure Order Basis for Coverage" and the other of which is the "Scientific Basis for Coverage." Fed. R. Civ. P. 8(d)(2), (3). Finally, Plaintiffs also assert Nationwide Class action claims for unjust enrichment and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, in the alternative, as set out in Counts IV and V.

## THE PARTIES

10.      2105-09 S. State, LLC is a limited liability company organized and existing under the laws of Illinois with its principal place of business at 2105 S. State Street, Chicago, IL 60616, located in Cook County and in the Northern District of Illinois. 2105-09 S. State, LLC conducts all its business operations in Illinois.

11.      Reggie's Bar & Grill, LLC is a limited liability company organized and existing under the laws of Illinois, with its principal place of business at 2105 S. State Street, Chicago, IL 60616, located in Cook County and in the Northern District of Illinois. Reggie's Bar & Grill, LLC conducts all its business operations in Illinois.

12.     Reggie's Music Club, LLC is a limited liability company organized and existing under the laws of Illinois, with its principal place of business at 2105 S. State Street, Chicago, IL 60616, located in Cook County and in the Northern District of Illinois. Reggie's Music Club, LLC conducts all its business operations in Illinois.

13.     Defendant The Cincinnati Insurance Company is an insurance company organized and existing under the laws of Ohio with its principal place of business at 6200 South Gilmore Road, Fairfield, OH 45014-5141.  Defendant is registered with the Illinois Department of Insurance to conduct business in Illinois. Defendant specializes in both commercial and personal lines of insurance.

## JURISDICTION AND VENUE

### *Subject Matter Jurisdiction*

14.     This Court has federal subject matter jurisdiction over the claims set forth in this action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

15.     2105-09 S. State, LLC is incorporated in and has its principal place of business in Illinois. Its member, Robert Glick is a natural person, a resident and citizen of the State of Illinois, Illinois being his true, fixed, and permanent home and principal establishment to which he intends to return whenever absent from it. Accordingly, 2105-09 S. State, LLC and its member are citizens of Illinois. Reggie's Bar & Grill, LLC is incorporated in and has its principal place of business in Illinois. Its member, Robert Glick is a natural person, a resident and citizen of the State of Illinois, Illinois being his true, fixed, and permanent home and principal establishment to which he intends to return whenever absent from it. Accordingly, Reggie's Bar & Grill, LLC and its member are citizens of Illinois. Reggie's Music Club, LLC is incorporated in and has its principal place of business in Illinois. Its member, Robert Glick is a natural person, a resident and citizen of the State of Illinois, Illinois being his true, fixed, and permanent home and principal establishment to which he intends to return whenever absent from it. Accordingly, Reggie's Music Club, LLC and its member are citizens of Illinois.

16.     Defendant is incorporated in and has its principal place of business in Ohio.  Accordingly,

Defendant is a citizen of Ohio.

17.     The amount in controversy in this action is well in excess of $75,000. Plaintiffs closed their locations completely from March 15, 2020 to May 21, 2020, losing all together at least $700,000 in business income. Beginning May 21, 2020, Plaintiffs opened only for take-out and on June 3, 2020 Plaintiffs opened only outdoor areas. Plaintiffs' partial opening resulted in mitigation of damages at best and Plaintiffs continue to lose a substantial amount of income. Additionally, as set forth in Count III below, Plaintiffs make a claim for statutory bad faith under 215 ILCS 5/154.6, which entitles Plaintiffs to statutory penalties and attorneys' fees of an additional $60,000 or more as of the time of filing of this action. Therefore, the amount in controversy in this action at the time of filing is well in excess of $75,000.

18.     This Court also has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) because Counts IV and V allege class action claims where "any member of a class of plaintiffs is a citizen of a state different from any defendant and the aggregated amount in controversy exceeds $5,000,000, exclusive of interest and costs." Plaintiffs are informed and believe that Defendant writes over $3 billion in commercial lines insurance premiums annually, so a premium rebate of less than one half of one percent would more than fulfill this amount in controversy.

***Personal Jurisdiction***

19.     The Court may exercise general personal jurisdiction over Defendant due to the fact that Defendant's activities in Illinois are such that Defendant may fairly be regarded as submitting itself to jurisdiction of the courts in Illinois. Defendant exercises substantial, systematic and continuous contacts with Illinois by doing business in Illinois, serving insureds in Illinois, and seeking additional business in Illinois.

20.     The Court may exercise specific personal jurisdiction over Defendant in this matter, as Plaintiff' claims arise out of Defendant's activities in Illinois.

21.     Further, Defendant has submitted to jurisdiction in the Northern District of Illinois pursuant to the Illinois "long arm statute," 735 ILCS 5/2-209, by: (a) transacting business in Illinois; (b) contracting to insure a person, property or risk located within this district at the time of contracting; and (c) making a

contract substantially connected with this district and Illinois.  *See* 735 ILCS 5/2-209(1), (4), (7).

22.     This Court has jurisdiction to grant declaratory relief under 28 U.S.C. § 2201 because an actual controversy exists between the parties as to their respective rights and obligations under the insurance Policy concerning Plaintiffs' loss of business income arising from the Closure Orders.

### *Venue*

23.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(1) and (c)(2) because Defendant is a resident in this district by virtue of being subject to the court's personal jurisdiction with respect to this action.

24.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

### **FACTS**

25.     Plaintiffs operate two adjacent establishments offering food, drinks, and live music in the Chicagoland area that have been in business for years, working hard to build up a patron base and develop an excellent reputation for quality and service. A key part of what Plaintiffs provide is atmosphere – a location where patrons can enjoy live music. Patrons go to Plaintiffs' establishments for the atmosphere and physical location. The nature of Plaintiffs' businesses requires the utilization of its physical business premises and the specialized equipment located therein to provide quality music, food, and drink. Direct personal service to its customers are Plaintiffs' stock in trade. By offering only limited services, Plaintiffs are mitigating their damages to the best of their ability. Plaintiffs' operations were brough to an immediate halt, and restricted to only certain services, which comprise a fraction of Plaintiffs' monthly revenue. Even with subsequent re-opening, Plaintiffs are functioning at reduced capacity and continue to sustain business income loss.

### The Policy and the Coverages

26.     Like many other reputable and honest small businesses, Plaintiffs conducted their businesses responsibly and obtained what is known in business and the insurance industry as a "Commercial General Liability" or "CGL" policy to protect itself and others from a myriad of risks.

27.     Defendant aggressively markets its coverage as being "everything insurance should be," and even "exceptional."[1]

28.     Plaintiffs purchased its Cincinnati Policy through an agent, J.J. Doorhy & Associates, Inc., 101 Burr Ridge Pkwy, Ste 206, Burr Ridge, IL 60527-0846.  (Ex. A).  Plaintiffs' Policy was effective from December 31, 2019 – December 31, 2020. Plaintiffs paid a premium to Defendant for the coverages in this Policy.  (Ex. A).

29.     The Policy is what is known in the insurance industry as "all risk" policy which provides broad coverage for losses sustained from *any cause*.

30.     In the Policy, Defendant promised to pay Plaintiffs for "actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations'" when Plaintiffs experienced a "direct physical loss of" or damage to its business premises. (Ex. A, p. 49) (Form CP00300607, p. 1 of 9).

31.     Defendant further promised in the Policy to pay Plaintiffs for "actual loss of Business Income you sustain . . . caused by action of civil authority that prohibits access" to Plaintiffs' business properties, provided that Plaintiffs' premises are within one mile from other "damaged property" and the civil authority order is in response to "dangerous physical conditions." (Ex. A, p. 50) (Form CP00300607, p. 2 of 9).

32.     In the Policy, Defendant promised to provide Plaintiffs with broad coverage for lost "business income" plus "extra expense" sustained during periods of shutdown and beyond.  (Ex. A, p. 49-50) (Form CP00300607, p. 1-2 of 9).

33.     The Policy contained purported exclusions including an "Exclusion of Loss due to Virus or Bacteria," which provides that Defendant will not pay for "loss or damage caused by or resulting from any virus, bacterium or other micro-organism that induces or is capable of inducing physical distress, illness or disease." (Ex. A, p. 67) (Form CP01400706). This exclusion is impermissibly overbroad and unenforceable.  Moreover, it introduces ambiguities into the Policy that must be construed against Cincinnati.

---

[1] The Cincinnati Insurance Company, https://www.cinfin.com/ (accessed September 30, 2020).

**Defendant's Systematic Denial of Claims**

34.     Despite Defendant's promises in the Policy to pay for lost business income and extra expenses incurred by Plaintiffs in circumstances such as these, Defendant has denied all such claims.

35.     Defendant is retaining, enjoying, and investing the premium / claims payment windfall it has achieved from profoundly lower commercial policy claims by its commercial insureds (members of the Nationwide Class) whose businesses are shuttered or reduced in operations by Closure Orders.

36.     Rather than honor its policies, Defendant's approach to these insurance claims has been to leave its insureds, the taxpayers, and society as a whole to bear the economic burden of Cincinnati's refusal to honor its own obligations under its policies. And Defendant's portfolio managers have been strategically investing the resulting windfall to reap even greater rewards.

37.     Defendant has designed and executed, in bad faith, a systematic and consistent form and cursory denial of all claims, such as Plaintiffs' claims, in order to avoid paying Defendant's obligations under the Policy.  After making its claims, Plaintiffs received Defendant's cursory, form denial letter (Ex. B) which Plaintiffs believe is similar in substance and form to thousands of letters Defendant has sent out to any and every insured who has made or will make a claim for losses sustained during the current crisis.

38.     Cincinnati failed to undertake or conduct a reasonable investigation of Plaintiffs' claims under its Policy, in violation of its duties under Illinois law. Moreover, Defendant fails to honor its obligations under thousands of policy contracts during the current crisis by not reviewing the facts and law for each case.

39.     Defendants' denials to Plaintiffs were not only woefully inadequate, but they were based on the false and blanket assertion that there is no "direct physical loss" or damage to property at the business premises of Plaintiff.  (Ex. B, p. 4-5). As set forth herein, that blanket assertion runs contrary to Illinois law, established science, and the facts.

**Federal Rule of Civil Procedure 8(d) Permits Alternative Pleading**

40.     The Federal Rules of Civil Procedure embody public policy and the mandate of law that parties may both plead in the alternative, and state as many separate claims (or defenses) as they may have, regardless of consistency:

> Rule 8. General Rules of Pleading
> .   .   .
> (d) Pleading to Be Concise and Direct; Alternative Statements; Inconsistency.
> .   .   .
> (2) Alternative Statements of a Claim or Defense. A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.
> (3) Inconsistent Claims or Defenses. A party may state as many separate claims or defenses as it has, regardless of consistency.

41.     Plaintiffs proffer in this case two fundamental, alternative bases for coverage: 1) **the Closure Order Basis for Coverage;** and 2) **the Scientific Basis for Coverage**.  Rule 8 permits, indeed mandates, that Plaintiffs may proceed with these alternative theories in the pursuit of justice.

**The Closure Order Basis for Coverage**

42.     A bedrock principle of Plaintiffs' case is that the Closure Orders caused direct physical loss and/or damage to its properties. While Defendant contends that Plaintiffs did not sustain "direct physical loss" or "damage" to property within the meaning of its Policy (Ex. B, p. 5), the evidence at trial will show that the Closure Orders did cause direct physical loss of and damage to Plaintiffs' properties. Under any reasonable construction, the phrase "direct physical loss of or damage to" property is broad and would include detrimental physical effects which alter and impair the functioning of the tangible, material dimensions of property – especially where, as here, property is rendered nonfunctional for its intended purpose due to the altered appearance, shape, and other material aspects of the properties. That is precisely the type of loss and damage caused by the Closure Orders.

43.     Defendant chose not to define the terms "direct physical loss" or "damage" in the Policy, nor did it define "direct physical damage" or "physical damage." Instead, Defendant intentionally left each of these terms undefined—even though it knew, or should have known, that these terms can reasonably be

construed, and indeed have been construed by courts, more broadly than the narrow self-serving definition that it contends should provide the terms only meaning. As undefined terms in the Policy, each of these terms must be given its plain and ordinary meaning consistent with the knowledge and expectations of an ordinary, reasonable insured.

44. In the Policy, "loss" is used in the alternative to "damage." Thus, there is coverage provided for both "loss" and "damage," either alternatively or collectively, because "loss" coverage is different from, and in addition to, "damage" coverage. Property "loss" refers to, among other things, being deprived of a property's function, while "damage" refers to, among other things, the impairment of property or a reduction in its functionality. The adjective "physical," among other things, distinguishes between the tangible, material aspects of an object and those that are purely intangible, such as sentiment, emotion, or imagination. In addition, under a plain grammatical reading of the phrase "direct physical loss of or damage to" property (or "direct physical loss or damage to" property), the words "direct" and "physical" can be reasonably construed as modifying only "loss" coverage—not "damage" coverage. To the extent that any language in the Policy is ambiguous, it should be construed against Defendant and in favor of coverage.

45. Here, the Closure Orders caused both property loss and property damage by directly, physically impairing the functionality of Plaintiffs' property and dispossessing Plaintiffs of their tangible spaces. Dining rooms, bars and stages closed, areas blocked off, barriers erected, appearances altered, furniture moved, fixtures altered, spaces shuttered, floors marked, plexiglass mounted—these are but some examples of the direct physical loss and damage Plaintiffs' properties have incurred.

46. The Plaintiffs understood, expected, and believed that their Policy would cover the direct physical loss of or damage to their properties that was suffered as a direct result of the Closure Orders. This understanding and expectation is both subjectively and objectively reasonable. Defendant cannot now redefine or narrow the meaning of physical loss or damage—or any other undefined terms in the Policy—to support a denial of coverage in these unprecedented circumstances.

47. Because there is a reasonable construction of these terms that provides coverage to Plaintiffs for their business interruption claims—and based on bedrock insurance law principles requiring

11

policy terms to be construed broadly in favor of coverage for the Plaintiff—Defendant must pay Plaintiffs' claims.

48.     Although the Policy contains a purported "Virus or Bacteria" exclusion (Ex. A, p. 67) (Form CP01400706), this exclusion does not and cannot function against claims for physical loss and damage caused by Closure Orders, not by a virus.  Any other reading of such an exclusion is impermissibly overbroad and unenforceable.

### The Scientific Basis for Coverage

49.     Reports of a novel Coronavirus ("COVID-19") pandemic emerged out of Wuhan, China in early 2020.  The first case in the United States was confirmed on January 20, 2020, followed rapidly by many others, culminating in a medical and economic disaster.[2]

50.     By March 15, 2020, Illinois Governor J.B. Pritzker, exercising his emergency powers under state law, ordered many public gathering places closed in an effort to slow or stop the spread of COVID-19. On March 20, 2020, Governor Pritzker ordered all "non-essential businesses" to close.  Similar orders were issued by Chicago Mayor Lori Lightfoot pursuant to her emergency powers under state law. Many similar orders have followed, all prohibiting or severely curtailing the use of business property and premises.

51.     Illinois law, science, and the facts contradict Defendant's cursory claims denials. Illinois courts have held that dangerous substances can and do cause "direct physical loss or damage" under commercial insurance policies. *See e.g.*, *Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Int'l Ins. Co.*, 720 N.E.2d 622, 625–26 (Ill. App. Ct. 1999), *as modified on denial of reh'g* (Dec. 3, 1999).

52.     COVID-19 may well be the most dangerous physical substance to emerge upon humankind to date during the 21st century. The danger of the presence of COVID-19 on a surface or in the air at a premises renders that premises potentially fatal and directly physically affected, damaged, and unfit for human use.  Like asbestos, COVID-19 can linger in the air or on surfaces (including equipment and air

---

[2] New England Journal of Medicine, March 5, 2020 https://www.nejm.org/doi/full/10.1056/NEJMoa2001191.

ducts on a business premises) and endanger human life. Unlike inanimate asbestos, COVID-19 can reproduce readily and expand its direct physical impact by infecting areas and persons quickly. Unlike inanimate asbestos, its direct physical impact cannot be encapsulated or contained on a premises. At the same time, there are no readily available and easy to administer tests to determine if COVID-19 exists on a property and no vaccine to slow or stop its spread, meaning its physical presence has a profoundly dangerous impact.

53.     Cincinnati essentially argues that because COVID-19 cannot be seen with the naked eye or is "invisible," that it can have no direct physical impact.

54.     COVID-19 physically exists.

55.     COVID-19 has a direct physical impact.

56.     COVID-19 alters property in appearance, shape, color, or other material dimensions.

57.     COVID-19 can be seen with an electron microscope to alter property in appearance, shape, color, or other material dimension.[3]

---

[3] https://www.sciencealert.com/this-is-what-the-covid-19-virus-looks-like-under-electron-microscopes

58.    This is an electron microscope image[4] of COVID-19 that depicts its physical existence:



59.    Cincinnati's arguments against coverage that COVID-19 causes a direct physical loss or damage to property (Ex. B) rejects the germ theory of disease proven more than a century ago by Louis Pasteur (1864).  The germ theory of disease states that microscopic pathogens, which include viruses too small to see without magnification, do physically exist.  Due to their physical existence, viral pathogens can move from the physical environs of property, invade humans and other living hosts, and cause fatal disease.

60.    Emerging research and recent reports from the CDC indicate that the COVID-19 pathogen strains physically impact and infect and can stay alive on surfaces for at least 17 days.[5]  Thus, a core scientific and epidemiological concept of the Closure Orders (and the loss of business property they

---

[4]https://www.sciencealert.com/this-is-what-the-covid-19-virus-looks-like-under-electron-microscopes
[5]https://www.cnbc.com/2020/03/23/cdc-coronavirus-survived-in-princess-cruise-cabins-up-to-17-days-after-passengers-left.html

mandate) is the necessary assumption that COVID-19 is physically and impactfully present on the surface of every premises and will be transmitted, resulting in harm and/or death.[6] This science is fundamental to the Closure Orders.[7]

61.    Government authorities on the federal, state, and local levels, including those in the jurisdiction in which the Plaintiffs are located, have based their orders on the scientifically supported presumption that COVID-19 exists at all business premises.[8]

62.    Government authorities issued Closure Orders that mandated the partial or complete shutdown of Plaintiffs' business operations.

63.    The complete shutdown of non-essential businesses, social distancing rules, mandatory masks, partial suspensions of other businesses, and many other elements underscore the scientific and governmental assumption that COVID-19 has a direct physical impact on premises everywhere. While economically devastating, this precept is a common theme to all of the Closure Orders in the United States.[9] The Closure Orders aim to save lives by "flattening the curve."[10]

64.    Cincinnati's arguments against coverage that a virus can cause direct physical loss or damage are contrary to well-established and peer-reviewed science developed and accepted over the past 156 years. Cincinnati's arguments also ignore current, cutting-edge science about COVID-19 that is saving lives in America today.

---

[6] Centers for Disease Control and Prevention, *Social Distancing, Quarantine and Isolation*, Coronavirus Disease 2019 (COVID-19) (April 4, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html; Harlan M. Krumholz, *If You Have Coronavirus Symptoms, Assume You Have the Illness, Even if You Test Negative*, The New York Times (April 1, 2020), https://www.nytimes.com/2020/04/01/well/live/coronavirus-symptoms-tests-false-negative.html.
[7] *When Could Things Reopen? How each State is Responding to COVID-19*, National Public Radio (April 9, 2020), https://www.npr.org/2020/03/12/815200313/what-governors-are-doing-to-tackle-spreading-coronavirus.
[8] *COVID-19 Expert Reality Check*, John Hopkins Bloomberg School of Public Health (April 6, 2020), https://www.globalhealthnow.org/2020-02/coronavirus-expert-reality-check.
[9] Harvey V. Fineberg, *Ten Weeks to Crush the Curve*, New England Journal of Medicine (April 1, 2020), https://www.nejm.org/doi/full/10.1056/NEJMe2007263?query=featured_coronavirus.
[10] Kathy Katella, *5 Things Everyone Should Know About the Coronavirus*, Yale Medicine (April 13, 2020), https://www.yalemedicine.org/stories/2019-novel-coronavirus/.

65.     Cincinnati failed to investigate, consider or even attempt to understand the scientific reasoning and basis of the Closure Orders, with which Plaintiffs were required to comply, leading directly to Plaintiffs' loss of business income and other losses.

66.     In discovery and at trial, Plaintiffs will present scientific evidence to support that COVID-19 causes a direct physical impact (including altering property in one or more of "appearance, shape, color or other material dimension") and to enable a jury to justly and fairly determine the controversies created by Cincinnati's coverage positions and denials. *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

**Defendant Owes Business Income Loss Coverage**

67.     Plaintiffs suffered a complete loss and damage to their business premises under the Closure Orders. Plaintiffs suffered a direct physical loss and damage to their music venues/restaurants and the business premises that enabled them to provide such products and services. Carryout, delivery, and outdoor dining are a mitigation of these losses that has allowed at best greatly reduced revenue.

68.     Under well-accepted legal and scientific principles, Plaintiffs sustained "a direct physical loss of or damage to property at premises"; thus, Defendant owes coverage for the resulting Business Income losses. (Ex. A, p. 49) (Form CP00300607, p. 1 of 9).

**Defendant Owes Civil Authority Coverage**

69.     In the alternative, Fed. R. Civ. P. 8(d), the Closure Orders were an "action of civil authority" that prohibited Plaintiffs' "access to the described premises" due to damage to property other than property at the described premises. (Ex. A, p. 50) (Form CP00300607, p. 2 of 9). Thus, Plaintiffs suffered a complete loss of access to its business premises under the Closure Orders.

70.     Because the Closure Orders prohibited access to every "non-essential" business in Illinois, "access to the area immediately surrounding" a "damaged property" was prohibited by governmental order encompassing many locations. (Ex. A, p. 50) (Form CP00300607, p. 2 of 9).

71.     Moreover, the Closure Orders were a response to "damaged property" with dangerous physical conditions threatening to human life within one mile of Plaintiffs' business locations.

16

72.     Reggie's establishments are located at 2105 S. State Street, Chicago and 2109 S. State Street, Chicago. Both locations are approximately 0.7 miles from Mercy Hospital & Medical Center at 2525 South Michigan Ave., Chicago. Reggie's locations are also 0.3 miles from COVID-19 testing site, Loop Medical Center-South Loop at 1921 S. Michigan Ave., Chicago and 0.6 miles from COVID-19 testing site, CLEAR Wellness Group at 1605 S. Michigan Ave., Chicago.

73.     The proximity of Plaintiffs' premises to two COVID-19 testing centers and a hospital, where persons suffering (and on information and belief, dying) from COVID-19 were located, is just one among many facts that Cincinnati would have discovered had it properly investigated Plaintiffs' claims before making its form denials.

74.     COVID-19 can also spread on particulate matter in the air.  Plaintiffs' business premises are in an urban area or close to an urban area with pollution in the air.[11] As a result, COVID-19 was spread throughout other locations within the area of Plaintiffs' premises.[12]

75.     Therefore, Plaintiffs have sustained business income losses:  a) by action of civil authority prohibiting access to its dining rooms, bars and music venues; b) because of dangerous COVID-19 within the area of one mile (if not on Plaintiffs' actual premises), and c) as a result of COVID-19 creating a dangerous physical condition to which civil authority responded, Defendant owes coverage under Civil Authority Coverage.  (Ex. A, p. 50) (Form CP00300607, p. 2 of 9).

**Defendant's Purported Virus or Bacteria Exclusion Fails**

76.     Moreover, to the extent that Defendant may attempt to rely on "Exclusion of Loss Due to Virus or Bacteria" (Ex. A, p. 67) (Form CP01400706), this exclusion is ineffective for numerous reasons.

77.     First, Defendant's Policy grants coverages including those listed above (among others) and then impermissibly attempts to take coverage away by hopelessly overbroad purported exclusionary language, which introduces ambiguity into the Policy that must be construed against Defendant.

---

[11]https://www.usatoday.com/story/news/health/2020/04/27/coronavirus-found-air-pollution-particles-preliminary-study-finds/3033646001/
[12]https://www.chicagotribune.com/coronavirus/ct-viz-covid-19-cases-by-zip-code-20200407-aikakoyycje4fbqvferzjffkg4-htmlstory.html

78. As alleged above, under the Closure Order Basis for Coverage this exclusion does not and cannot function against claims for physical loss and damage caused by Closure Orders, not by a virus. Any other reading of such an exclusion is impermissibly overbroad and unenforceable.

79. Secondly, even if a virus exclusion was somehow enforceable, it must be narrowly construed under Illinois law. The following illustrate a non-exclusive list of why Defendant's purported virus exclusion fails as to all theories of coverage, including the Scientific Basis for Coverage:

a. "It is the insurer's burden to affirmatively demonstrate the applicability of an exclusion." *Pekin Insurance Co. v. Miller*, 367 Ill. App. 3d 263, 267 (Ill. App. Ct. 2006).

b. When an insurer relies upon exclusionary policy language to deny or limit coverage, the language's application to the facts must be clear and free from doubt. *Cohen Furniture Co. v. St. Paul Insurance Co. of Illinois*, 214 Ill. App. 3d 408, 412–13 (Ill. App. Ct. 1991). The language here is neither clear nor free from doubt given the language of the Policy granting broad and numerous coverages, when weighed against the facts and science and all of the issues put into contention by the Closure Orders compelling Plaintiffs' shutdown, and Defendant's factual denials that any of this presents "direct physical loss" or damage.

c. In situations where insurance policy language is ambiguous or uncertain, then that language must be construed in favor of the insured and against the insurer who wrote the policy language at issue. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 108-09 (Ill. 1992).

d. When a question arises as to coverage where more than one cause contributed to a loss, some of which are covered and some of which may be excluded under a policy, courts will narrowly construe the exclusion language, as it is in derogation of coverage. *Bozek v. Erie Insurance Group*, 46 N.E.3d 362, 368 (Ill. App. Ct. 2015).

80. Here, the factual and scientific evidence to be presented at trial will demonstrate that the dominant cause of the losses suffered by the Plaintiffs are the Closure Orders – and therefore, under the appropriate construction of the virus exclusion, the purported exclusion cannot apply.

81. Additionally, the virus exclusion is overly broad and violates public policy. It is against public policy for an Illinois-licensed insurance carrier such as Cincinnati to exercise the privilege of collecting premiums in Illinois in exchange for such broadly-worded "all risk" coverages and then attempt to exclude coverage on the ill-based, cursory and conclusory arguments Defendant has interposed in denying Plaintiffs coverage.

82. Defendant's reliance on any purported virus exclusion fails.

## CLAIMS BY PLAINTIFF: OVERVIEW

83.     The conduct set forth at length above constitutes Defendant's breach of the Policy contract. Plaintiffs have sustained damages as a result of that breach, in the form of substantial Business Income losses that continue to mount, including Extra Expense.

84.     By engineering this scheme to avoid its obligations under the Policy, Defendant breached its contract and exhibited bad faith by putting itself at a tremendous economic advantage over practically all other American business enterprises who honor their contractual obligations and continue to carry this nation through the current crisis. Defendant is retaining and lucratively investing claims dollars it would have to pay out, or premium dollars it would have to rebate, if it chose to follow the law.

85.     Defendant has engaged in consistent misconduct across its claims handling in this time of crisis.  Defendant's reflexive denial of claims by Plaintiffs and thousands of other insureds at their time of need is arbitrary and unreasonable, inconsistent with the facts and plain language of the Policy, and flies in the face of well-established science.

86.     Defendant's denials were driven by a desire to preempt its own financial exposure to the economic fallout resulting from the Closure Orders, rather than to initiate, as Defendant is obligated to do, a full and fair investigation of the claims and a careful review of the Policy Defendant sold in exchange for valuable premiums.

87.      Defendant improperly shifted the burden on Plaintiffs to retain counsel, initiate litigation (such as this), and expend great time, money, and opportunity cost.  Instead of taking care of its employees and struggling businesses, Plaintiffs have been forced to come to court to compel Defendant to honor its contractual obligations.

88.     Plaintiffs file this lawsuit for a declaratory judgment establishing that they are entitled to receive the benefit of the insurance coverage they purchased, for indemnification of the business losses they sustained, for breach of contract, and for bad faith claims handling under 215 ILCS 5/155 – which entitles Plaintiffs to penalties and attorneys' fees. Alternatively, Plaintiffs, on behalf of themselves and all others similarly situated, chooses to stand up against Defendant who would (as alluded to above) "have its cake

and eat it too" and be unjustly enriched by retaining premium dollars it should disgorge if Defendant prevails on its coverage denials (Count IV, unjust enrichment). This same conduct also violated the Illinois Consumer Fraud and Deceptive Business Practices Act and the similar laws of other states where Defendant sells insurance (Count V). Fed. R Civ. P. 8(d)(2), (3).

**COUNT I**
**DECLARATORY JUDGMENT**

89.     Plaintiffs incorporate by reference, as if fully set forth herein, the allegations set forth in paragraphs 1 to 88 above.

90.     The Policy is an insurance contract under which Plaintiffs paid premiums in exchange for Defendant's promise to pay losses and damages for claims covered by the Policy, including, but not limited to, Business Income losses and losses incurred as a result of the Closure Orders that forced Plaintiffs to close their businesses in whole or in part.

91.     Plaintiffs have complied with all applicable provisions of its Policy, including payment of the premiums in exchange for coverage under the Policy.

92.     Defendant has arbitrarily, unreasonably, and without justification refused to reimburse Plaintiffs for any losses and damages incurred in connection with the covered business losses set out at length above.

93.     An actual case or controversy exists regarding the Plaintiffs' rights and Defendant's obligations under the Policy to reimburse Plaintiffs for the full amount of losses and damages incurred by Plaintiff.

94.     Pursuant to 28 U.S.C. § 2201, Plaintiffs seek a declaratory judgment from this Court declaring the following: (a) Plaintiffs' losses and damages are insured under its Policy; (b) Defendant has waived any right it may have had to assert defenses to coverage or otherwise to seek to bar or limit coverage for those losses and damages by issuing blanket coverage denials without conducting a claim investigation as required under Illinois law; and (c) Defendant is obligated to pay Plaintiffs for the full amount of the losses and damages incurred and to be incurred in connection with the covered business losses and damages up to the applicable limits of coverage.

## COUNT II
## BREACH OF CONTRACT

95.     Plaintiffs incorporate by reference, as if fully set forth herein, the allegations set forth in paragraphs 1 to 88 above.

96.     The Plaintiffs' Policy is an insurance contract under which Plaintiffs paid premiums in exchange for Defendant's promise to pay losses and damages for claims covered by the Policy, including, but not limited to, Business Income losses and damages and losses and damages incurred as a result of the Closure Orders, as set forth at length above.

97.     Plaintiffs have complied with all applicable provisions of their Policy, including payment of the premiums in exchange for coverage, and yet Defendant has abrogated its insurance coverage obligations.

98.     By denying coverage for the business losses and damages incurred by Plaintiffs and set forth at length above, Defendant has breached its coverage obligations under the Policy.

99.     As a result of Defendant's breaches of the Policy, Plaintiffs have sustained substantial damages for which Defendant is liable, in an amount to be established at trial.

## COUNT III
## STATUTORY PENALTY FOR BAD FAITH DENIAL OF INSURANCE

100.     Plaintiffs incorporate by reference, as if fully set forth herein, the allegations set forth in paragraphs 1 to 88 above.

101.     Upon receipt of Plaintiffs' claims and (upon information and belief), upon receipt of each and every claim related to the Closure Orders, Defendant denied the claims, without conducting any investigation, let alone a "reasonable investigation based on all available information" as required under Illinois law. *See* 215 ILCS 5/154.6.

102.     To make matters worse, based on information and belief, Defendant directed its insurance agents to send sham claims communications stating that Plaintiffs' claims were not covered. Defendant formulated and executed on a plan to discourage policyholders such as Plaintiffs from submitting claim

notifications in order to avoid any responsibility for its policyholders' staggering losses, in violation of Illinois law.

103.    On information and belief, Defendant has also propagated rumor and innuendo that a purported government bailout of business income claims may occur, to further discourage claims.

104.    Defendant's denials were vexatious and unreasonable.  Defendant's actions disregarded or ignored facts underlying the claims, ignored the law, and ignored the science designed to save human life.

105.    Defendant's denials constitute "improper claims practices" under Illinois law – namely Defendant's: (1) refusal to pay Plaintiffs' claims without conducting reasonable investigations based on all available information; and (2) failure to provide reasonable and accurate explanations of the bases in its denials.  *See* 215 ILCS 5/154.6 (h), (n).

106.    Defendant has neither offered any justifiable reason for its denials, nor raised any bona fide disputes as to the whether the claims were covered.

107.    Therefore, pursuant to 215 ILCS 5/155, Plaintiffs request that, in addition to entering a judgment in favor of Plaintiffs and against Defendant for the amount owed under their Policy at the time of judgment, the Court enter a judgment in favor of Plaintiffs for an amount equal to the greater of: (1) 60% of the amount which the trier of fact finds that Plaintiffs are entitled to recover under their Policy, exclusive of costs; and (2) $60,000.  *See* 215 ILCS 5/155.

108.    Plaintiffs further request that the Court enters a judgment in favor of Plaintiffs and against Defendant in an amount equal to the attorneys' fees and costs incurred by Plaintiffs for the prosecution of this coverage action against Defendant, which amount will be proved at or after trial, pursuant to 215 ILCS 5/155.

## PRAYER FOR RELIEF ON COUNTS I - III

**WHEREFORE,** Plaintiffs pray that this Honorable Court enter an order and judgment in their favor and against Defendant, The Cincinnati Insurance Company as follows:

(a) Enter a declaratory judgment on Count I of the Complaint in favor of Plaintiffs and against Defendant declaring that: losses by Plaintiffs incurred in connection with the Closure Orders

and the necessary interruption of its businesses are insured losses and damages under the Policy; that Defendant has waived any right it may have had to assert defenses to coverage or otherwise seek to bar or limit coverage for the losses and damages of Plaintiffs by issuing blanket coverage denials without conducting a claim investigation as required under Illinois law; and that Defendant is obligated to pay Plaintiffs for the full amount of the losses and damages incurred and to be incurred in connection with the covered business losses and damages related to the Closure Orders;

(b) Enter a judgment on Count II of the Complaint in favor of Plaintiffs and against Defendant and award damages for breach of contract in an amount to be proven at trial;

(c) Enter a judgment on Count III of the Complaint in favor of Plaintiffs and against Defendant in the amount equal to the greater of (1) 60% of the amount which the trier of fact finds that Plaintiffs are entitled to recover under the Policy, exclusive of costs; and (2) $60,000;

(d) Enter a judgment in favor of Plaintiffs and against Defendant in an amount equal to all attorneys' fees and related costs incurred for the prosecution of this coverage action against Defendant pursuant to 215 ILCS 5/155, such amount to be established at the conclusion of this action;

(e) Award Plaintiffs and against Defendant prejudgment interest, to be calculated according to law, to compensate them for the loss of use of funds caused by Defendant's wrongful refusal to pay Plaintiffs what it is rightfully owed under the Policy; and,

(f) Award Plaintiffs such other, further, and additional relief as this Court deems just and appropriate.

### COUNT IV (in the alternative)
### CLASS ACTION
### UNJUST ENRICHMENT BY COLLECTION / RETENTION OF PREMIUM

109. Plaintiffs incorporate by reference, as if fully set forth herein, the allegations set forth in paragraphs 1 to 88 above.

110. Plaintiffs for themselves, and on behalf of all others similarly situated, allege this class action claim against Defendant in the alternative (see Fed. R. Civ. P. 8(d)(2), (3)) and as follows:

111. This is a class action count brought in diversity between the Class and Defendant, wherein jurisdiction lies under 28 U.S.C. § 1332.

112. If Defendant's denials of coverage for Plaintiffs' claims for business interruption coverage are upheld, then Defendant has been unjustly enriched in the amount of excess premium for business interruption coverage it has charged and retained while Plaintiffs' properties have been shut down or operationally impaired as the result of the Closure Orders. These premiums should be disgorged to all affected members of a Class of Defendant's insureds, as set out below.

113. Defendant priced and charged premiums for the Plaintiffs' Policy (and the policies of the members of the Nationwide Class) on the basis of their insured properties operating as fully functional business establishments. Accordingly, the insured risks included the prospect of having to pay claims for lost business income at levels commensurate with fully operational businesses, and for other risks (such as on liability insurance claims among others) commensurate with fully operational businesses.

114. During the time period while Plaintiffs' properties have been lost, damaged, shut down or otherwise operationally impaired by the Closure Orders, Defendant's risk of having to pay other claims under its "all-risk" policies, including business interruption claims and others, has been reduced in many instances to zero and in all instances by substantial monetary amounts. The Policy contains provisions making Defendant liable to pay business interruption loss only to the extent it would not have been incurred anyway, such as the provision taken below from the Policy:

> Business Income means the: (a) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and (b) Continuing normal operating expenses incurred, including payroll.

> (Ex. A, p. 49) (Form CP00300607, p. 1 of 9).

115. For example, if Plaintiffs' establishments were to suffer a total fire loss tomorrow, Defendant would decline to pay any business interruption loss that would have been incurred anyway as the result of the Closure Orders.

116.    Defendant knows all this, yet it has intentionally continued to charge and collect as "earned"—and Plaintiffs and the Class have continued to pay including on renewals—premiums for which Defendant, according to its own self-serving justifications for denying coverage, assumed no commensurate risk.

117.    Defendant has been unjustly enriched, at Plaintiffs' and the Class' expense, and should be required to disgorge to Plaintiffs and each Class member the full amounts of excess premium for business interruption coverage and other coverages it has unlawfully charged, collected, and retained, as equity and good conscience require. Defendant's misconduct in this respect has been willful, wanton, and in bad faith.

118.    This action may properly be maintained as a class action pursuant to the provisions of Fed. R. Civ. P. 23(b)(3). Plaintiffs bring this action on behalf of itself and on behalf of a Nationwide Class (as defined herein) of similarly situated businesses that have been irreparably harmed by Defendant, further defined as follows:

119.    This is a Nationwide Class of similarly situated persons defined as follows: all businesses in the United States who are insureds of Defendant under commercial insurance policies and who have experienced a complete or partial shutdown of their business operations as a result of a Closure Order issued by a State or local governmental authority on or after March 1, 2020, to the present.

120.    Excluded from this Class are: (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Class; (4) any person who had their claims in this matter adjudicated and/or otherwise released; and, (5) the legal representatives, successors, and assigns of any such excluded person.

121.    This action is brought as a class action and may properly be so maintained pursuant to the provisions of Federal Rule of Civil Procedure 23(b)(3). Plaintiffs reserve the right to modify the Nationwide Class and the class period pursuant to discovery that is conducted hereafter.

122.     Plaintiffs and all members of the Nationwide Class have been harmed by Defendant in a singular and common manner – they have been overcharged for premium for "all risk" commercial insurance policies and business interruption coverage during the current crisis, all to the unjust enrichment of Defendant.

123.     Numerosity: On information and belief, the Nationwide Class is so numerous that joinder of all individual plaintiffs is not practicable. The exact number of members of the Class is unknown and can only be ascertained through discovery because that information is exclusively within the possession, custody, and control of Defendant. However, on information and belief, Plaintiffs estimate that there are tens of thousands of potential Class members (if not hundreds of thousands) because Defendant sells commercial insurance in 41 states and Washington D.C. Defendant is registered with the Illinois Department of Insurance and markets its policies to millions of Illinoisans and Illinois businesses, as well as in other states. The members of the Class can be identified easily through records maintained by Defendant and/or by other means.

124.     Commonality and Predominance: There are questions of fact and law common to the Plaintiffs and the Class members which predominate over any questions relating to individual Class members. Some of the predominant, common questions include but are not necessarily limited to: 1) whether Defendant has been unjustly enriched in the amount of excess premium for "all risk" and business interruption coverage it has charged and retained while Class members' businesses have been shut down or operationally impaired as the result of Closure Orders; 2) whether Defendant has priced and charged premiums for Class members' policies on the basis of their properties operating as fully functioning businesses; 3) whether Defendant's risk of having to pay other commercial claims including business interruption claims has been reduced in many instances to zero and in all instances by substantial monetary amounts; 4) whether the policies contain provisions making Defendant liable to pay business interruption loss and other claims only to the extent it would not have been incurred anyway; 5) whether Defendant has, knowing all this, continued to charge and collect as "earned" premiums for which Defendant, according to

its own self-serving justifications for denying coverage, assumed no commensurate risk; and 6) whether Defendant has, accordingly, been unjustly enriched.

125. <u>Adequacy of Representation</u>: Plaintiffs will fairly and adequately protect the interests of the Class members in that Plaintiffs' claims are typical of the Class and Plaintiffs do not have any interests which are adverse to the other Class members. Plaintiffs' claims are based on similar facts and the same legal theories as those of the Class members. Plaintiffs have retained competent counsel, experienced in handling class actions, complex business transactions and litigating complex commercial disputes. Plaintiffs intend to prosecute this action vigorously. Neither Plaintiffs nor counsel have any interests which might cause them to not vigorously prosecute this action. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the Nationwide Class.

126. <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the members of the Nationwide Class because Plaintiffs paid premium for "all risk" commercial insurance policies including business interruption insurance and were shut down by Closure Orders, yet were never refunded or rebated their premium by Defendant. Plaintiffs and all members of the Nationwide Class have thus similarly suffered harm arising from Defendant's violations of law as alleged herein.

127. <u>Appropriateness</u>: Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy described herein because it permits a large number of injured persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of evidence and effort. Class treatment is especially appropriate for the current controversy because it is the only practical means for Class members to receive redress given that the individual claims for refund of premium are likely not economically viable to pursue on an individual basis (as contrasted to their individual and sizeable business interruption claims, which Defendant, of course, has denied). The premium rebate damages suffered by each individual Class member likely are disproportionate to the burden and expense of individual prosecution of complex and extensive litigation to proscribe Defendant's conduct and practices. The disposition of the claims in a class action will provide a substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits. A class action provides the benefits of

fewer management difficulties, single adjudication, economy of scale and comprehensive supervision by a single court, and would result in reduced time, effort, and expense for all parties and the Court, and ultimately ensure the uniformity of decisions.

**COUNT V (in the alternative)**
**CLASS ACTION**
**ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**

128.    Plaintiffs incorporate by reference, as if fully set forth herein, the allegations set forth in paragraphs 1 to 88 and 109-127 above.

129.    Plaintiffs for itself, and on behalf of all others similarly situated, allege this class action claim against Defendant in the alternative (see Fed. R. Civ. P. 8(d)(2), (3)) and as follows:

130.    This is a class action count brought in diversity between the Class and Defendant, wherein jurisdiction lies under 28 U.S.C. § 1332.  Plaintiffs incorporate by references, as if fully set forth herein, the class action allegations set forth in Count IV, above.

131.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* ("ICFA") and the similar laws of other states where Defendant sells insurance, provide protection to persons including Plaintiffs and the members of the Nationwide Class by mandating fair competition in commercial markets for goods and services.

132.    ICFA and the similar laws of other states where Defendant sells insurance prohibit any deceptive, unlawful, unfair or fraudulent business acts or practices using deception, fraud, false pretenses, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact, or the employment or use of any deceptive practice described as a deceptive trade practice.

133.    Defendant is a "person" as defined by ICFA and the similar laws of other states where Defendant does business.

134.    Plaintiffs and each member of the Nationwide Class are persons protected by ICFA and similar laws of other states where Defendant does business.

135.    Defendant's sales of insurance policies, collection of premiums, and administration of claims constitutes an activity covered by ICFA and similar laws of other states where Defendant does business.

136.    Defendant's retention and collection of full and undiscounted / unrebated premiums, including (but not limited to) upon renewal of policies, under the circumstances pled herein wherein the Defendant did not take on commensurate risk supporting those premiums, from businesses affected by Closure Orders, are deceptive and unfair acts or practices prohibited by ICFA and the similar laws of other states where Defendant does business.

137.    Defendant violated ICFA and the similar laws of other states where Defendant does business when it misrepresented and omitted facts regarding the premium charged (at a full and undiscounted / unrebated rate) and the commensurate risk actually taken on and the coverage actually afforded (including but not limited to that Defendant would not pay for business interruption losses for businesses whose income was already interrupted or reduced by Closure Orders).

138.    Defendant's conduct was knowing and intentional.

139.    Plaintiffs and members of the Nationwide Class relied upon Defendant's misrepresentations and omissions when they purchased, paid on, continued, and renewed their policies with Defendant.

140.    Defendant's misrepresentations and omissions pled herein were acts likely to mislead the Plaintiffs and the Nationwide Class acting reasonably under the circumstances, and thus constitute unfair and deceptive practices in violation of ICFA and the similar laws of other states where Defendant does business.

141.    As a direct and proximate result of Defendant's violation of ICFA and the similar laws of other states where Defendant does business, Plaintiffs and the members of the Nationwide Class have suffered harm in the form of excess premiums paid in exchange for their policies, because they paid more premium than what they otherwise would have paid had they known the truth – that Defendant was not assuming risk commensurate with those premiums charged.

29

142.     Defendant's practices set forth herein offend public policy, were and are immoral, unethical, oppressive and unscrupulous, and cause substantial injury to Plaintiffs and the members of the Nationwide Class, who were protected by ICFA and the similar laws of other states where Defendant does business.

**PRAYER FOR RELIEF ON COUNTS IV AND V (in the alternative)**

**WHEREFORE,** Plaintiffs individually, and on behalf of all persons similarly situated, pray that this Honorable Court enter an order and judgment in their favor and against Defendant, The Cincinnati Insurance Company as follows:

(a) Finding that this action satisfies the prerequisites for maintenance of a class action set forth in Fed. R. Civ. P. 23(b)(3), and certifying the Class as defined above;

(b) Designating Plaintiffs as the representatives of the Class and the undersigned counsel as Class Counsel;

(c) Entering judgment in favor of Plaintiffs and the Class and against Defendant on the unjust enrichment claim (Count IV) set forth above in an amount to be proven at trial;

(d) Entering judgment in favor of Plaintiffs and the Class and against Defendant on the claim for violation of ICFA and the similar laws of other states where Defendant does business (Count V), including compensatory damages and punitive damages as permitted by law and in an amount to be proven at trial;

(e) Awarding Plaintiffs and the Class pre-judgment interest, their court costs, expenses, and reasonable attorneys' fees; and,

(f) Awarding Plaintiffs any such other and further relief that this Court deems necessary and just.

**JURY DEMAND**:

Plaintiffs hereby demand trial by jury on all issues so triable.

Dated: October 22, 2020

Respectfully Submitted,

FUKSA KHORSHID, LLC


*/s/ William E. Meyer, Jr.*

William E. Meyer, Jr.

*Attorney for Plaintiffs and for the Class*

FUKSA KHORSHID, LLC
William E. Meyer, Jr. (ARDC No. 6207345) of counsel
Lema A. Khorshid (ARDC No. 6283237)
Vincent P. Formica (ARDC No. 6319168)
200 W. Superior, Suite 410
Chicago, IL 60654
T: 312.266.2221
F: 312.266.2224
williammeyer222@comcast.net
lema@fklawfirm.com
vince@fklawfirm.com